**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BEAZLEY UNDERWRITING LTD | * | Case No.: 3:22-cv-872 |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Date:  July 11, 2022 |
| | * | |
| MODA LLC, | * | |
| | * | |
| and | * | |
| | * | |
| MB FISHER LLC, | * | |
| | * | |
| and | * | |
| | * | |
| MFF-NW LLC, | * | |
| | * | |
| and | * | |
| | * | |
| EASY SPIRIT LLC, | * | |
| | * | |
| Defendants. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Beazley Underwriting Ltd ("Beazley"), by undersigned counsel, brings this complaint for a declaratory judgment against Defendants Moda LLC ("Fisher"), MB Fisher LLC ("Marc Fisher"), MFF-NW LLC ("Nine West") and Easy Spirit LLC ("Easy Spirit") (Fisher, Marc Fisher, Nine West, and Easy Spirit are referred to together as "Moda").

Pursuant to 28 U.S.C. § 2201 and as the lead underwriter of the Beazley Breach Response insurance policy that was underwritten by members of Lloyd's Syndicates 2623/623 ("Underwriters") and issued to Moda (the "Policy"), Beazley seeks a declaration that the Policy does not provide coverage to Moda for its $5,631,550.68 claimed loss, and pleads in support:

I.      **INTRODUCTION**

1.      This insurance coverage action arises out of the misappropriation of funds from Moda's online payout accounts from September 22, 2021 to November 1, 2021.

2.      After discovering that its funds were missing, Moda retained the law firm Kasowitz Benson Torres LLP ("Kasowitz"), which then retained Capsicum Group ("Capsicum") on November 5, 2021, "to conduct a root cause analysis concerning the misappropriation of Moda's funds."[1]

3.      Capsicum set forth its findings in a report dated March 30, 2022 (the "Capsicum Report"),[2] which includes the following overview of Moda's loss:

> On November 1, 2021, Moda discovered that funds derived from the online sales of its Marc Fisher, Nine West, and Easy Spirit businesses (the "Online Revenue") were missing from their respective payout accounts maintained by Shopify and their respective designated bank accounts. Shopify is the e-commerce platform responsible for processing Moda's online sales and placing the Online Revenue into the payout accounts of each of Moda's affiliates (the "Payout Accounts"). Moda may elect to transfer the Online Revenue into designated bank accounts of its own that are linked to the Payout Accounts hosted by Shopify.

In total, Moda's affiliates lost $5,487,443.79 in Online Revenue.[3]

4.      Four and a half months before the Capsicum Report was published, however, Underwriters informed Moda that the Policy does not cover Capsicum's or Kasowitz's fees.

5.      Specifically, during telephone calls on November 17 and 18, 2021, which was two weeks after Moda retained Kasowitz and Capsicum, Underwriters explained to Moda that the Policy requires that **Breach Response Services** be provided by the providers listed in the Policy's Information Packet, as set forth in the following provision:

---

[1] *See* Exhibit A (Capsicum Report), p. 1.
[2] *See id.*
[3] *See id.*, at pp. 1–2.

**Breach Response Services** will be provided by providers listed in the Information Packet [and] will be subject to the terms and conditions of this Policy and the Information Packet[.[4]]

6.      Neither Kasowitz nor Capsicum are providers listed in the Policy's Information Packet.

7.      By letter dated December 14, 2021, Underwriters denied coverage under the Policy's Breach Response Insuring Agreement for any fees incurred by Kasowitz and Capsicum, while also asking Moda that if it, "would like to take advantage of the coverage available under the Breach Response Insuring Agreement by engaging vendors from [Underwriters'] panel, please let us know." [5]

8.      In the same letter, Underwriters also asked Moda that if it, "is interested in other coverage potentially available under the Policy, please let us know so that we can schedule another call to get additional information about this incident and its impact on [Moda's] business operations."[6]

9.      On March 31, 2022, Moda submitted a Proof of Loss for Business Interruption Loss to Underwriters ("Proof of Loss").[7]

10.      Moda's Proof of Loss requests coverage under the Policy's *Business Interruption Loss* Coverage for two categories of loss; specifically: (a) $5,487,443.79 in **Income Loss** for the

---

[4] *See* Exhibit B (the Policy), Beazley Breach Response Coverage Part, Page 4 of 23; *see also* Information Packet; Beazley, *Service providers*, Beazley Breach Response (BBR) in Cyber & Tech Service providers (last visited July 11, 2022); available at:
https://www.beazley.com/london_market/cyber_and_executive_risk/cyber_and_tech/beazley_breach_response/beazley_bbr_service_providers.html.

[5] *See* Exhibit C (Underwriters' December 14, 2021 Letter to Moda), at p. 5.

[6] *See id.*

[7] *See* Exhibit D (Moda's Proof of Loss).

misappropriation of funds; and (b) $144,106.89 in **Extra Expense** and/or **Forensic Expenses** for

Kasowitz's and Capsicum's fees.[8]

11. Moda appended the Capsicum Report to its Proof of Loss.[9]

12. By letter dated July 11, 2022, Underwriters denied coverage under the Policy for

Moda's claimed loss in the Proof of Loss.[10]

13. Beazley does not have an obligation to indemnify Moda under the Policy's *Business*

*Interruption Loss* coverage for its claimed loss for at least five reasons, summarized as follows:[11]

a. Moda's claimed loss does not satisfy the Policy's *Business Interruption Loss* Coverage's definition of **Business Interruption Loss**, because Moda's claimed loss was not sustained: (i) "as a result of the actual interruption of the **Insured Organization's** business operations;" nor (ii) during a **Period of Restoration**, which is defined as, "the 180-day period of time that begins upon the actual and necessary interruption of the **Insured Organization's** business operations."

b. The $5,487,443.79 in misappropriated funds that Moda seeks as **Income Loss** does not satisfy the Policy's definition of **Income Loss**, since those amounts are neither "net profit or loss before interest and tax that the **Insured Organization** would have earned or incurred" nor "continuing normal operating expenses . . .."

c. The $144,106.89 that Moda incurred by the two service providers Capsicum and Kasowitz does not satisfy the definition of "**Forensic Expenses**," which is defined as, "reasonable and necessary expenses incurred by the **Insured Organization** to investigate the source or cause of a **Business Interruption Loss**."

d. The $144,106.89 that Moda incurred by the two service providers Capsicum and Kasowitz does not satisfy the definition of "**Extra Expense**," which is defined as, "reasonable and necessary expenses incurred by the **Insured Organization** during the **Period of Restoration** to minimize, reduce or avoid **Income Loss**, over and above those expenses the **Insured Organization** would have incurred had no **Security Breach**, **System Failure**, **Dependent Security Breach** or **Dependent System Failure** occurred."

---

[8] *See id.*
[9] *See id.*
[10] *See* Exhibit F (Underwriters' July 11, 2022 Letter to Moda).
[11] *See id.*

e.  The Policy's Trading Losses, Loss of Money & Discount Exclusion precludes coverage for Moda's claimed loss, specifically any "**Loss** arising out of . . . 2. Any loss, transfer or theft of monies, securities or tangible property of the **Insured** or others in the care, custody or control of the **Insured Organization**."

14.    The Policy also does not provide coverage for Capsicum's and Kasowitz's fees under the Breach Response Insuring Agreement because neither Capsicum nor Kasowitz are providers in the Policy's Information Packet.[12]

15.    Beazley reserved its right to deny or limit coverage on other grounds as well.[13]

16.    In order to resolve the actual controversy between Underwriters and Moda concerning the parties' rights and legal obligations under the Policy for Moda's claimed loss, Beazley brings this action for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 and Rule 57 of the Federal Rules of Civil Procedure.

## II.    THE PARTIES

17.    Plaintiff, Beazley Underwriting Ltd ("Beazley"), is a company incorporated in England and Wales with its principal place of business in the United Kingdom, and is the sole member of Syndicate 2623.  Beazley is the lead underwriter of the Policy and a determination in this action will be binding on all of the Policy's underwriters ("Underwriters").

18.    Defendant Moda LLC ("Fisher") is a limited liability company with its principal place of business in Connecticut, at 777 W Putnam Ave, Greenwich, CT 06830-5091.  On information and belief, the sole member of Fisher is Marc B Fisher, who is a natural person that is domiciled in Connecticut, and thus Fisher is a citizen of Connecticut.

19.    Defendant MB Fisher LLC ("Marc Fisher") is a limited liability company with its principal place of business in Connecticut, at 777 W Putnam Ave, Greenwich, CT 06830-5091.

---

[12] *See id.*
[13] *See id.*

On information and belief, the sole member of Marc Fisher is Marc B Fisher, who is a natural person that is domiciled in Connecticut, and thus Marc Fisher is a citizen of Connecticut.

20.     Defendant MFF-NW LLC ("Nine West") is a limited liability company with its principal place of business in Connecticut, at 777 W Putnam Ave, Greenwich, CT 06830-5091. On information and belief, the sole member of Nine West is Marc B Fisher, who is a natural person that is domiciled in Connecticut, and thus Nine West is a citizen of Connecticut.

21.     Defendant Easy Spirit LLC ("Easy Spirit") is a limited liability company with its principal place of business in Connecticut, at 777 W Putnam Ave, Greenwich, CT 06830-5091. On information and belief, the sole member of Easy Spirit is Marc B Fisher, who is a natural person that is domiciled in Connecticut, and thus Easy Spirit is a citizen of Connecticut.

### III.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(2) because this is an action between Beazley, which is a citizen or subject of a foreign state, and the Defendants, which are all citizens of Connecticut, and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

23.     This Court has personal jurisdiction over Defendants because their principal place of business is in Connecticut.

24.     This district is proper for this lawsuit pursuant to 28 U.S.C. § 1391(b)(1)–(3) because the Defendants reside in Connecticut, the subject Policy was issued in Connecticut, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

### IV.     FACTUAL BACKGROUND

#### A.     The Policy

25.     Underwriters issued Beazley Breach Response Policy No. W2D2BB200101 to

Moda LLC for the **Policy Period** of November 23, 2020 to November 23, 2021 (the "Policy").[14]

26.     Moda LLC (Fisher) is the Policy's **Named Insured.**

27.     The other three Defendants, MB Fisher LLC (Marc Fisher), MFF-NW LLC (Nine

West) and Easy Spirit LLC (Easy Spirit), are included in the Policy's definition of **Insured**

**Organization** pursuant to the Policy's Amend Definition of Insured Organization–Scheduled

Entities Endorsement.

28.     Per the Policy's Lloyd's Certificate, "[t]his Insurance is effected with certain

Underwriters at Lloyd's London," and:

> issued in accordance with the limited authorization granted to the Correspondent
> [Beazley USA] by certain Underwriters at Lloyd's, London whose syndicate
> numbers and the proportions underwritten by them can be ascertained from the
> office of the said Correspondent (such Underwriters being hereinafter called
> "Underwriters") and in consideration of the premium specified herein,
> Underwriters hereby bind themselves severally and not jointly, each for his own
> part and not one for another, their Executors and Administrators.[15]

29.     Beazley is the sole member of Syndicate 2623 and is the Policy's lead underwriter.

30.     A true and correct copy of the Policy, with premium information redacted, is

attached hereto as Exhibit B.

31.     The Policy is Claims Made and Reported, with a Limit of Liability of $3 million

for Business Interruption Loss, subject to a retention of $25,000 for each incident, and a $3 million

Policy Aggregate Limit of Liability, as well as an Additional Breach Response Limit of $3 million,

subject to a retention of $10,000 but $5,000 for Legal.[16]

### 1.     The Policy's Business Interruption Loss Coverage

---

[14] Terms in bold are defined in the Policy.
[15] Exhibit B (the Policy), at Lloyd's Certificate, Page 1 of 2.
[16] *See id.*, Declarations.

32.     Subject to all of the Policy's terms, conditions, and exclusions, the Business Interruption Loss coverage under the Policy's First Party Loss Insuring Agreement provides coverage for:

**First Party Loss**

> To indemnify the **Insured Organization** for:

*Business Interruption Loss*

> > **Business Interruption Loss** that the **Insured Organization** sustains as a result of a **Security Breach** or **System Failure** that the **Insured** first discovers during the **Policy Period**.[17]

*     *     *

33.     The Policy defines **Business Interruption Loss** as:

> 1. **Income Loss**;
>
> 2. **Forensic Expenses**; and
>
> 3. **Extra Expense**;
>
> > actually sustained during the **Period of Restoration** as a result of the actual interruption of the **Insured Organization's** business operations caused by a **Security Breach** or **System Failure**. Coverage for **Business Interruption Loss** will only apply after the **Waiting Period** has elapsed.
>
> > **Business Interruption Loss** will not include (i) loss arising out of any liability to any third party; (ii) legal costs or legal expenses; (iii) loss incurred as a result of unfavorable business conditions; (iv) loss of market or any other consequential loss; (v) **Dependent Business Loss**; or (vi) **Data Recovery Costs**.[18]

*     *     *

34.     The Policy defines **Income Loss** as, "an amount equal to:

> 1.     net profit or loss before interest and tax that the **Insured Organization** would have earned or incurred; and

---

[17] *See id.*, Beazley Breach Response Coverage Part, Page 1 of 23.
[18] *See id.*, Beazley Breach Response Coverage Part, Page 4 of 23.

2.      continuing normal operating expenses incurred by the **Insured Organization** (including payroll), but only to the extent that such operating expenses must necessarily continue during the **Period of Restoration.**[19]

*        *        *

35.      The Policy defines **Forensic Expenses** as "reasonable and necessary expenses incurred by the **Insured Organization** to investigate the source or cause of a **Business Interruption Loss**."[20]

36.      The Policy defines **Extra Expense** as "reasonable and necessary expenses incurred by the Insured Organization during the **Period of Restoration** to minimize, reduce or avoid **Income Loss**, over and above those expenses the **Insured Organization** would have incurred had no **Security Breach**, **System Failure**, **Dependent Security Breach** or **Dependent System Failure** occurred."[21]

37.      The Policy defines **Period of Restoration** as, "the 180-day period of time that begins upon the actual and necessary interruption of the **Insured Organization's** business operations."[22]

### 2.      The Policy's Breach Response Coverage

38.      Subject to all of the Policy's terms, conditions, and exclusions, the Policy's Breach Response Insuring Agreement provides coverage for:

To provide **Breach Response Services** to the **Insured Organization** because of an actual or reasonably suspected **Data Breach** or **Security Breach** that the **Insured** first discovers during the **Policy Period**.[23]

---

[19] *See id.*, Beazley Breach Response Coverage Part, Page 9 of 23.

[20] *See id.*, Beazley Breach Response Coverage Part, Page 8 of 23.

[21] *See id.*, Beazley Breach Response Coverage Part, Page 7 of 23.

[22] *See id.*, Beazley Breach Response Coverage Part, Page 11 of 23.

[23] *See id.*, Beazley Breach Response Coverage Part, Page 1 of 23.

39.     The Policy defines **Breach Response Services**, in pertinent part, as, "the following

fees and costs in response to an actual or reasonably suspected Data Breach or Security Breach:

1       for an attorney to provide necessary legal advice to the **Insured Organization** to evaluate its obligations pursuant to **Breach Notice Laws** or a Merchant **Services Agreement** and in connection with providing the **Breach Response Services** described below;

2       for a computer security expert to determine the existence, cause and scope of an actual or reasonably suspected Data Breach, and if such Data Breach is actively in progress on the Insured Organization's Computer Systems, to assist in containing it[.24]

40.     The Policy also provides in pertinent part that, "**Breach Response Services** will be

provided by providers listed in the Information Packet [and] will be subject to the terms and

conditions of this Policy and the Information Packet . . .."[25]

### B.      Moda's Claimed Loss

41.     According to the documents and information provided by Moda to Underwriters,

Fisher uses the ecommerce platform provided by Shopify to process online sales for Fisher's

affiliates, including Marc Fisher, Nine West, and Easy Spirit.

42.     According to the documents and information provided by Moda to Underwriters,

when customers place orders with Marc Fisher, Nine West, and Easy Spirit, the online revenue

from the orders is maintained in an account belonging to the respective business.

43.     According to the documents and information provided by Moda to Underwriters,

Marc Fisher, Nine West, and Easy Spirit maintain respective control over their payout accounts

with Shopify and can elect to transfer the Online Revenue into designated bank accounts of their

own.

---

[24] *See id.*, Beazley Breach Response Coverage Part, Pages 3–4 of 23.

[25] *See id.*

44.     According to the documents and information provided by Moda to Underwriters, on or around August 4, 2021, a bad actor gained access to the Office 365 account of Moda's internal ecommerce administrator, and monitored the administrator's role, responsibilities, and account access for approximately 49 days.

45.     According to the documents and information provided by Moda to Underwriters, on September 22, 2021, while using the administrator's email account, the bad actor requested a password reset to Moda's payout accounts maintained with Shopify.

46.     According to the documents and information provided by Moda to Underwriters, the bad actor implemented a series of email rule changes on the Moda administrator's email account that deleted legitimate emails from Shopify representatives, and also sent imposter emails to the administrator that purported to be from Shopify representatives, which allowed the password reset and bank account changes (as discussed below) to remain undetected for several weeks.

47.     According to the documents and information provided by Moda to Underwriters, the bad actor then replaced the bank account linked to Easy Spirit's payout account with an unknown bank account, which allowed the bad actor to transfer the online revenue that Easy Spirit had already collected to a non-Moda bank account.

48.     According to the documents and information provided by Moda to Underwriters, from September 22 to November 1, 2021, the bad actor substituted the Moda bank accounts linked to the Marc Fisher, Nine West, and Easy Spirit payout accounts with unknown bank accounts 32 times, which allowed the bad actor to transfer approximately $6,293,096.66 in funds from the payout accounts.

49.     According to the documents and information provided by Moda to Underwriters, after discovering that funds had been redirected from the payout accounts, Moda worked with Shopify and was able to recover $805,652.87.

**C.     Moda's Insurance Claim And Underwriters' Coverage Positions**

50.     On November 3, 2021, two days after allegedly discovering the misappropriation of its funds, Moda reported this matter to Underwriters.

51.     During two telephone calls on November 17 and 18, 2021, which was approximately two weeks after Moda allegedly discovered the misappropriation of funds and retained Kasowitz and Capsicum, Underwriters and Moda discussed the Policy's requirement that **Breach Response Services** be provided by the providers listed in the Information Packet subject to the terms and conditions of the Policy and Information Packet.

52.     By letter dated December 14, 2021, Underwriters informed Moda that while this matter implicates the Breach Response Insuring Agreement, coverage would not extend to fees or costs incurred by Kasowitz or Capsicum under the Policy's Breach Response Services coverage because they are not providers listed in the Information Packet.

53.     On March 31, 2022, Moda submitted the Proof of Loss documenting expenses and other costs Moda incurred in connection with this incident.

54.     Notably, appended to the Proof of Loss was the Capsicum Report published on March 30, 2022, which was more than three and a half months after Underwriters informed Moda that coverage was not available for Capsicum because it is not listed on the Information Packet.

55.     Moda's Proof of Loss, totaling $5,631,550.68, is comprised of the following categories of claimed loss:

| Loss Category | Amount |
|---|---|
| Kasowitz Fees | $50,068.13 |
| Capsicum Fees | $94,038.76 |
| Misappropriated Funds | $5,487,443.79 |
| **Total** | **$5,631,550.68** |

56.      By letter dated July 11, 2022, Underwriters denied coverage under the Policy for

Moda's claimed loss based on the information and documents comprising Moda's Proof of Loss.[26]

## COUNT I – DECLARATORY JUDGMENT (NO COVERAGE)
## MODA'S CLAIMED LOSS DOES NOT SATISFY THE POLICY'S *BUSINESS INTERRUPTION LOSS* COVERAGE'S DEFINITION OF BUSINESS INTERRUPTION <u>LOSS</u>

57.      Beazley incorporates by reference the foregoing allegations in Paragraphs 1

through 57.

58.      Moda has not and cannot show that the Policy's *Business Interruption Loss*

Coverage provides coverage for its claimed loss.

59.      Specifically, the Policy's *Business Interruption Loss* coverage provides coverage

for **Business Interruption Loss**, which is defined in pertinent part as:

> 1.      **Income Loss**;
>
> 2.      **Forensic Expenses**; and
>
> 3.      **Extra Expense**;
>
> actually sustained during the **Period of Restoration** as a result of the actual interruption of the **Insured Organization's** business operations caused by a **Security Breach** or **System Failure**. Coverage for **Business Interruption Loss** will only apply after the **Waiting Period** has elapsed.

60.      Moda cannot show that its loss satisfies the definition of **Business Interruption**

**Loss** for at least two reasons.

---

[26] *See* Exhibit F (Underwriters' July 11, 2022 Letter to Moda).

61.     First, Moda's claimed loss was not sustained "as a result of the actual interruption of the **Insured Organization's** business operations."

62.     Rather, Moda did not sustain any interruption of its business operations, as the bad actor transferred funds from Moda's Shopify account without Moda's awareness and there was no "actual interruption" of Moda's business operations.

63.     Second, Moda's claimed loss was not sustained during a **Period of Restoration**.

64.     Rather, this matter does not involve a **Period of Restoration**, as defined in the Policy, because there was never a "necessary interruption" of Moda's business operations, *i.e.* the period of time after discovering the breach or failure to fix the problem where it was necessary for Moda to maintain the interruption of its business operations.

65.     Accordingly, Beazley is entitled to a declaration that it does not have an obligation to indemnify Moda under the Policy's *Business Interruption Coverage* because Moda's claimed loss does not satisfy the definition of **Business Interruption Coverage**.

### COUNT II – DECLARATORY JUDGMENT (NO COVERAGE) MODA'S CLAIMED LOSS FOR MISAPPROPRIATED FUNDS DOES NOT SATISFY THE POLICY'S DEFINITION OF INCOME LOSS

66.      Beazley incorporates by reference the foregoing allegations in Paragraphs 1 through 66.

67.     The Policy does not provide coverage for the $5,487,443.79 that Moda is claiming in **Income Loss**, *i.e.* the misappropriated funds from Moda's Shopify payout accounts, because that loss do not satisfy the Policy's definition of **Income Loss**.

68.     Specifically, Moda's misappropriated funds are neither "net profit or loss before interest and tax that the **Insured Organization** would have earned or incurred" nor "continuing normal operating expenses . . .."

69.    Accordingly, Beazley is entitled to a declaration that it does not have an obligation to indemnify Moda under the Policy's *Business Interruption Coverage* for its claim for misappropriated funds because that claimed loss does not satisfy the Policy's definition of **Income Loss**.

## COUNT III – DECLARATORY JUDGMENT (NO COVERAGE)
## MODA'S CLAIMED LOSS FOR CAPSICUM'S AND KASOWITZ'S FEES DOES NOT SATISFY THE POLICY'S DEFINITION OF FORENSIC EXPENSES

70.    Beazley incorporates by reference the foregoing allegations in Paragraphs 1 through 70.

71.    Moda's Proof of Loss also seeks $144,106.89 that Moda incurred by the two service providers Capsicum and Kasowitz as **Forensic Expenses** under the Policy's *Business Interruption Loss* Insuring Agreement.

72.    Capsicum's and Kasowitz's fees do not satisfy the definition of **Forensic Expenses**, which in pertinent part is, "reasonable and necessary expenses incurred by the **Insured Organization** to investigate the source or cause of a **Business Interruption Loss**."

73.    As pled above, because Moda's misappropriated funds do not satisfy the Policy's definition of **Business Interruption Loss**, it follows that the expenses incurred by Capsicum and Kasowitz to investigate the source or cause of those misappropriated funds are not **Forensic Expenses**.

74.    Further, Moda has not and cannot show that Capsicum's and Kasowitz's expenses were "reasonable and necessary" to "investigate the source or cause" of Moda's loss.

75.    Accordingly, Beazley is entitled to a declaration that it does not have an obligation to indemnify Moda under the Policy's *Business Interruption Coverage* for Kasowitz's and Capsicum's fees because those amounts do not satisfy the definition of **Forensic Expenses**.

**COUNT IV – DECLARATORY JUDGMENT (NO COVERAGE)**
**MODA'S CLAIMED LOSS FOR CAPSICUM'S AND KASOWITZ'S FEES DOES NOT SATISFY THE POLICY'S DEFINITION OF EXTRA EXPENSE**

76.     Beazley incorporates by reference the foregoing allegations in Paragraphs 1 through 76.

77.     Moda's Proof of Loss also seeks $144,106.89 that Moda incurred by the two service providers Capsicum and Kasowitz as **Extra Expense** under the Policy's *Business Interruption Loss* Insuring Agreement.

78.     Capsicum's and Kasowitz's fees do not satisfy the definition of **Extra Expense**, which in pertinent part is, "reasonable and necessary expenses incurred by the **Insured Organization** during the **Period of Restoration** to minimize, reduce or avoid **Income Loss**."

79.     As pled above, this matter does not involve a **Period of Restoration**, and neither Kasowitz's nor Capsicum's fees were incurred during any **Period of Restoration**.

80.     Further, neither Kasowitz's nor Capiscum's fees were reasonable and necessary expenses incurred by Moda to minimize, reduce or avoid **Income Loss**.

81.     Accordingly, Beazley is entitled to a declaration that it does not have an obligation to indemnify Moda under the Policy's *Business Interruption Coverage* for Kasowitz's and Capsicum's fees because those amounts do not satisfy the definition of **Extra Expense**.

**COUNT V – DECLARATORY JUDGMENT (NO COVERAGE)**
**MODA'S CLAIMED LOSS FOR CAPSICUM'S AND KASOWITZ'S FEES ARE NOT COVERED UNDER THE BREACH RESPONSE INSURING AGREEMENT BECAUSE THEY ARE NOT SERVICE PROVIDERS IN THE INFORMATION PACKET**

82.      Beazley incorporates by reference the foregoing allegations in Paragraphs 1 through 82.

83.     Capsicum's and Kasowitz's fees are also not covered under the Policy's Breach

Response Insuring Agreement because neither Capsicum nor Kasowitz is a provider in the Policy's

Information Packet.

84.     Subject to all of the Policy's terms, conditions, and exclusions, the Policy's Breach

Response Insuring Agreement provides coverage for:

> To provide **Breach Response Services** to the **Insured Organization** because of an
> actual or reasonably suspected **Data Breach** or **Security Breach** that the **Insured**
> first discovers during the **Policy Period**.[27]

85.     The Policy defines **Breach Response Services**, in pertinent part, as, "the following

fees and costs in response to an actual or reasonably suspected Data Breach or Security Breach:

> 1       for an attorney to provide necessary legal advice to the **Insured
> Organization** to evaluate its obligations pursuant to **Breach Notice Laws**
> or a Merchant **Services Agreement** and in connection with providing the
> **Breach Response Services** described below;
>
> 2       for a computer security expert to determine the existence, cause and scope
> of an actual or reasonably suspected Data Breach, and if such Data Breach
> is actively in progress on the Insured Organization's Computer Systems, to
> assist in containing it[.28]

86.     The Policy also provides that, "**Breach Response Services** will be provided by

providers listed in the Information Packet [and] will be subject to the terms and conditions of this

Policy and the Information Packet . . .."29

87.     Neither Capsicum nor Kasowitz are providers listed in the Policy's Information

Packet.

---

[27] Policy, p. 1, Insuring Agreements (Breach Response).
[28] Policy, p. 3–4, Definitions (Breach Response Services).
[29] *Id.*

88.     Accordingly, Beazley is entitled to a declaration that it does not have an obligation to indemnify Moda under the Policy's Breach Response Coverage for Kasowitz's and Capsicum's fees because neither provider is listed in the Policy's Information Packet.

**COUNT VI – DECLARATORY JUDGMENT (NO COVERAGE)**
**MODA'S CLAIMED LOSS IS PRECLUDED BY THE POLICY'S TRADING, LOSSES,**
**LOSS OF MONEY & DISCOUNT EXCLUSION**

89.     Beazley incorporates by reference the foregoing allegations in Paragraphs 1 through 89.

90.     To the extent that Moda is able to satisfy the insuring requirements in the Policy's *Business Interruption Coverage* or Breach Response Insuring Agreement for any of its loss, which Beazley denies, then the Policy's Trading Losses, Loss of Money & Discount Exclusion precludes coverage for all of Moda's claimed loss.

91.     The Policy's Trading Losses, Loss of Money & Discount Exclusion precludes coverage in pertinent part for "**Loss** arising out of . . . 2. Any loss, transfer or theft of monies, securities or tangible property of the Insured or others in the care, custody or control of the **Insured Organization** . . .."

92.     Here, Moda's claimed loss is arising out of the loss, transfer, or theft of monies that was in the care, custody, and control of Moda, specifically the Shopify Payout Accounts of Marc Fisher, Nine West, and Easy Spirit, which are included in the definition of **Insured Organization**.

93.     The Capsicum Report, submitted by Moda, conclusively establishes that funds in Moda's Shopify Payout Accounts ware in the care, custody, and control of Moda.

94.     Accordingly, Beazley is entitled to a declaration that it does not have an obligation to indemnify Moda because the Policy's Trading Losses, Loss of Money & Discount Exclusion precludes coverage for Moda's claimed loss.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Beazley Underwriting LTD respectfully requests that this Court Declare and Order:

A.  The Policy's *Business Interruption Coverage* does not provide coverage for all of Moda's claimed loss since it does not satisfy the definition of **Business Interruption Loss** because: (i) there was no actual interruption of Moda's business operations; and/or (ii) Moda's claimed loss was not sustained during a **Period of Restoration**;

B.  The Policy's *Business Interruption Coverage* does not provide coverage for Moda's misappropriated funds because that claimed loss does not satisfy the Policy's definition of **Income Loss**;

C.  The Policy's *Business Interruption Coverage* does not provide coverage for Capsicum's and Kasowitz's fees because that claimed loss does not satisfy the Policy's definition of **Forensic Expenses**;

D.  The Policy's *Business Interruption Coverage* does not provide coverage for Capsicum's and Kasowitz's fees because that claimed loss does not satisfy the Policy's definition of **Extra Expense**;

E.  The Policy's Breach Response Insuring Agreement does not provide coverage for Capsicum's and Kasowitz's fees because neither Capsicum nor Kasowitz is a provider listed in the Policy's Information Packet;

F.  The Policy's Trading Losses, Loss of Money & Discount Exclusion precludes coverage for all of Moda's claimed loss; and

G.  For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Beazley demands a trial by jury in this action of all issues so triable.

Dated: July 11, 2022

Respectfully submitted,

TROUTMAN PEPPER
HAMILTON SANDERS LLP

By: __/s/ Daniel W. Cohen__
Daniel W. Cohen (Bar No. ct 30467)
875 Third Avenue
New York, NY 10022
Telephone:  (212) 704-6006
Facsimile:  (202) 654-5807
Email:  dan.cohen@troutman.com

Kevin F. Kieffer
(*pro hac vice* to be filed)
kevin.kieffer@troutman.com
5 Park Plaza
Suite 1400
Irvine, CA  92614-2545
Telephone:     949.622.2700
Facsimile:     949.622.2739

James H. Geiser
(*pro hac vice* to be filed)
james.geiser@troutman.com
401 9th Street NW, Suite 1000
Washington, DC 20004
Telephone:     202.274.2947

Counsel for Beazley Underwriting Ltd